Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SALEHA ABDULLAH

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SALEHA ABDULLAH, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br>v.<br><br>FIFTH THIRD BANK, NATIONAL ASSOCIATION,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff SALEHA ABDULLAH ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant FIFTH THIRD BANK, NATIONAL ASSOCIATION ("Defendant" or "Fifth Third"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.53.com (the "Website"), a website that Defendant provides for public access and use.

2. Plaintiff personally used the Website during the class period, including on September 2, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of her own browsing session. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received.

3. Plaintiff's HAR file accordingly records the requests her browser transmitted to the Third Parties identified below during that session, including the named fields carrying the contents of her communications and the persistent identifiers transmitted with them. The allegations below concerning those transmissions are drawn from that record.

4. During her use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting third parties to intercept the contents of her communications and reveal the personal financial subject matter she was reading about.

5. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page addresses identifying what she was browsing, the titles identifying the subject matter of the pages she was reading, and

the words appearing on the links she selected, by causing each such communication to be duplicated and routed to the Third Parties over separate channels. The page addresses, the page titles, and the link words were routed to Salesforce. The page addresses, descriptions of the pages, and the link words were routed to Adobe.

6. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications and transmit them without notice or consent. Neither recipient received a bare address. Each received a structured event in which the page the user was viewing had already been described in words, together with the identifier by which that recipient recognizes the user across visits. Those words were composed under configuration Defendant deployed on the Website, and that configuration carried them into the outbound transmissions.

7. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Plaintiff directly observed the Website configured in this manner during her September 2, 2026 session, and it remains so configured. On information and belief, and subject to proof following discovery of Defendant's tag-management records and its agreements with the Third Parties, the Website was configured in this manner throughout the class period.

## II. GENERAL ALLEGATIONS

8. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent image or a snippet of code that executes when a page loads or when a user takes an action on the page.

9. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website, such as the address and title of the page being viewed and the words of the links the user selects, together with identifiers that allow the third party to recognize the same browser

on later visits.

10. When users visit the Website, Defendant causes tracking technology to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Salesforce Tracker
- The Adobe Tracker

11. Each of the third parties that operate the above-listed trackers conducts a business of its own and has the capability to use the intercepted contents of users' communications collected via the Website for purposes of its own, including building and maintaining profiles of individual visitors, attributing successive page views and interactions to those profiles, merging activity recorded under an anonymous identifier into the profile of an identified individual, and making those profiles available for segmentation and targeting.

12. The Trackers are operated by distinct third parties, namely Salesforce, Inc. (as to the Salesforce Tracker) and Adobe Inc. (as to the Adobe Tracker). Defendant selected each, obtained an account with each, and deployed each under identifiers assigned to Defendant. The Trackers (collectively, the "Trackers") and the third parties that operate them (collectively, the "Third Parties") are referred to herein as such.

13. Defendant configured the Website so that the contents of each user's communication with the Website were duplicated into separate third-party transmissions. When a user loaded a page, the address and title of that page were written into named fields of a request directed to Salesforce, the title again into a second request directed to Salesforce, and the address of that page into a request directed to Adobe. When a user selected a link on a page, the address of that page, the address of the page before it, a description of that page, and the words of the link selected were written into named fields of requests directed to Salesforce and to Adobe. Each of those requests also carried a persistent identifier by which the recipient recognizes the browser.

14. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent

to the interception, duplication, or transmission of the contents of their communications to the Third Parties.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

16. Plaintiff SALEHA ABDULLAH is a California citizen residing in Contra Costa County, California, and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on September 2, 2026. Plaintiff is not a customer of Defendant. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant FIFTH THIRD BANK, NATIONAL ASSOCIATION is a national banking association chartered under the laws of the United States with its main office in Cincinnati, Ohio. Defendant's indirect parent company is Fifth Third Bancorp. Defendant owns, operates, and controls the Website. Through the Website, Defendant markets and offers consumer and commercial banking products and services and publishes financial education content directed to consumers.

18. Defendant owned, operated and controlled the Website at all times during the class period, and publicly identifies www.53.com as its own website.

19. Through the Website and its branch network, Defendant conducts banking business in California and in other states.

## IV. JURISDICTION AND VENUE

20. This Court has specific personal jurisdiction over Defendant because Defendant has purposefully availed itself of the privilege of conducting business in California, deliberately operates the Website for use by California consumers, has directed California-based tracking infrastructure at those consumers' communications, and because Plaintiff's claims arise directly out of that California-directed conduct.

21. Defendant maintains a substantial physical presence in California. Defendant's indirect parent, Fifth Third Bancorp, merged with Comerica Incorporated

on February 1, 2026. On September 8, 2026, Fifth Third Bancorp announced that it had completed the conversion of approximately 600,000 customer accounts and 293 banking centers in Arizona, California, Florida, Michigan and Texas from the Comerica franchise onto Fifth Third's platforms and under the Fifth Third brand. Fifth Third Bancorp states that the deposit and credit products offered under that brand are provided by Defendant. In announcing the conversion, Fifth Third Bancorp directed former Comerica customers to a page on the Website for information about what to expect.

22. Fifth Third Bancorp has publicly identified California as one of the high-growth markets in which it continues to invest. It states that, of the approximately 1,750 branches it expects to operate by 2030, more than half will be located in high-growth markets that include California.

23. Defendant conducts banking, lending, and financial-services business directed at consumers nationwide, including California consumers, and operates the Website without any California-specific gating or geolocation restriction. The Website is the conduct at issue in this Complaint, and California consumers visiting the Website are among the population from which Defendant causes communications to be intercepted.

24. Defendant deliberately installed and continues to operate on the Website tracking infrastructure supplied by two companies headquartered in this State. Salesforce, Inc. is a Delaware corporation headquartered in San Francisco, California. Adobe Inc. is a Delaware corporation headquartered in San Jose, California. Defendant's deliberate installation of their code causes outbound requests bearing California users' page addresses, the words describing those pages, the words of the links those users select, and persistent identifiers to flow to the infrastructure of those California companies.

25. Plaintiff's claims arise directly out of and relate to these California contacts. When Plaintiff visited the Website from California, Defendant's deliberately installed tracking infrastructure caused the contents of her communications with the Website,

including the addresses and titles of the financial education pages she read and the words of the links she selected, to be transmitted from her device in California to the Third Parties, accompanied by persistent identifiers assigned to her browser.

26. Exercise of personal jurisdiction in this District over Defendant for these California-arising claims is reasonable and consistent with traditional notions of fair play and substantial justice.

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

28. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

29. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship. Plaintiff is a citizen of California. Defendant, a national banking association, is a citizen of Ohio, the State in which its main office is located.

30. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from her Contra Costa County residence and the execution of the Trackers on her device in this District. Defendant is also subject to personal jurisdiction in this District with respect to this action and therefore resides here for venue purposes under 28 U.S.C. § 1391(c)(2).

31. **Divisional Assignment**. Pursuant to Civil L.R. 3-2(c), (d) and 3-5(b), this action is properly assigned to the San Francisco Division or the Oakland Division

because a substantial part of the events or omissions giving rise to the claims occurred in Contra Costa County.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

32. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, declaring that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

33. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

34. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing. The communications intercepted here were not bare records of connection. They were the addresses and titles of pages concerning how to improve one's credit score, how to save and budget, and how to save money on a tight budget, and the words of the links Plaintiff selected while reading them, each attached to a persistent identifier that recognizes the browser across visits.

35. That reading concerns more than a general topic. Pages on improving one's

credit score, on saving and budgeting, and on saving money on a tight budget address the reader's own personal financial considerations, and a record of which of those pages a person chose to read is information about her personal finances. Information of that kind is information people ordinarily keep to themselves. It was not recorded here as an anonymous page count. It was attached to identifiers that recognize Plaintiff's browser across visits, and to a user record that Salesforce states it merges into the profile of an identified individual once the visitor is identified. The disclosure of that information to commercial companies, without notice or consent, is an injury of the kind the privacy torts have long redressed.

36. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2. The Federal Wiretap Act**

37. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act of 1986 (ECPA), prohibits the intentional interception of wire, oral, or electronic communications. 18 U.S.C. § 2511(1)(a). The statute defines "intercept" as the acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device, 18 U.S.C. § 2510(4), and defines "contents" to include any information concerning the substance, purport, or meaning of that communication, 18 U.S.C. § 2510(8).

38. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications, and the requests a browser sends to a website and the responses it receives are electronic communications within the meaning of 18 U.S.C. § 2510(12).

39. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available

relief includes preliminary and other equitable or declaratory relief, the greater of actual damages and any profits made by the violator or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, punitive damages in appropriate cases, and reasonable attorney's fees and litigation costs. 18 U.S.C. § 2520(b), (c)(2).

## VI. SPECIFIC ALLEGATIONS

40. During her use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting the Third Parties to intercept the contents of her communications:

- https://www.53.com/content/fifth-third/en/financial-insights/personal/financial-education/how-to-improve-your-credit-score-in-a-year.html;
- https://www.53.com/content/fifth-third/en/financial-insights/personal/saving-budgeting.html; and
- https://www.53.com/content/fifth-third/en/financial-insights/personal/saving-budgeting/how-to-save-money-tight-budget.html.

41. During those visits both Trackers described below operated on the Website, and each received the contents of Plaintiff's communications as to the pages identified above. None of the requests to either Third Party carried a cookie header; the identifiers described below were instead carried in the outbound requests themselves.

### 1. The Salesforce Tracker

42. Defendant embedded and configured on the Website a personalization and behavioral tracking tag operated by Salesforce, Inc., which Salesforce markets as Marketing Cloud Personalization. Plaintiff's browser downloaded the tag's JavaScript library from a content delivery network operated for Salesforce during her session, from a path bearing Defendant's Salesforce account identifier and the name of a dataset Defendant maintains with Salesforce for its production website. The transmissions that

followed were directed to a Salesforce host assigned to Defendant's account and carried that same account identifier and dataset name. The tag is not a resource Plaintiff requested and is not necessary to render the Website's content.

43. Plaintiff's browser began loading each page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Salesforce's code. That code obtained the address of the page then being loaded, the address of the page Plaintiff had come from, and the title of the page, from the state of the browser for that page, wrote those values into named fields of new requests, and directed Plaintiff's browser to send those requests to Salesforce.

44. Two such requests were sent to Salesforce as each page loaded. The first carried a structured event. In named fields of that event were the full address of the page Plaintiff was reading, the full address of the page she had read before it, a page type, an interaction name, an indication that the event arose from the loading of a page, and an anonymous user identifier. Salesforce's documentation of that event structure describes the address field as the address of the page from which the event is sent; the referrer field as the previous address the user visited, which the library fills from the browser by default; the page type field as the type of page from which the event is sent; the interaction field as the means of capturing the user's engagement; and the anonymous identifier field as the identifier of an anonymous user. Interaction Event Options in the SalesforceInteractions Namespace, Salesforce Developers, https://developer.salesforce.com/docs/marketing/personalization/guide/event-options-salesforceinteractions.html.

45. The interaction names Salesforce received in those events, from Plaintiff's own session, were "How to improve your credit score in a year Page View," "Saving & Budgeting | Financial Insights Page View," and "How to Save Money on a Tight Budget Page View." Each is the title of the page Plaintiff was reading, with Defendant's name removed and the words "Page View" put in its place. The page type carried on every event from these pages was "Financial Insights Pages." The second request carried the

same words, in the query string, in a field Salesforce names as the action, together with the same anonymous identifier.

46. Those words were composed by the configuration Defendant deployed. Salesforce explains that a sitemap is built to integrate its library with a particular website. The sitemap contains a configuration for each type of page on the site. Each configuration gives the page type its name, supplies the test by which the library decides whether the page being loaded is of that type, and sets the action or interaction to be sent when the configuration is evaluated. Salesforce further states that no events are sent to it until the sitemap is initialized. Sitemap Implementation, Salesforce Developers, https://developer.salesforce.com/docs/marketing/personalization/guide/sitemap-implementation.html; Page Types, Salesforce Developers, https://developer.salesforce.com/docs/marketing/personalization/guide/page-types.html.

47. The library Plaintiff's browser downloaded, from the path bearing Defendant's account identifier, contains in plain text the sitemap configured for Defendant's website. That sitemap reads the title of the page from the browser, removes Defendant's name from it, puts the words "Page View" in its place, and supplies the result as the interaction name. It assigns the page type "Financial Insights Pages" to every page whose address contains the words financial-insights. And it initializes itself only when the page is served from Defendant's domain. Defendant therefore did not merely permit a third party's code to run on its pages. Defendant deployed the configuration under which that code described each page in words, and that description was carried with the data.

48. Salesforce describes the anonymous identifier as an identifier generated by its web library that typically stays the same on a given device, and states that its library includes that identifier in every event it sends. Salesforce states that identifiers its library generates for anonymous users consist of sixteen hexadecimal characters. Salesforce defines a user, in its system, as a record that attempts to track and personalize for one

individual. User Identity Mapping, Salesforce Developers, https://developer.salesforce.com/docs/marketing/personalization/guide/user-identity-mapping.html.

49. Salesforce describes how it handles an event when it arrives. Salesforce states that its server maps each incoming event to a user record. An event that carries no other identity is treated as anonymous, and the anonymous identifier becomes the user identifier. When the anonymous visitor later logs in or is otherwise identified, Salesforce automatically merges the activity recorded under the anonymous identifier into the identified user's profile. User Identity Mapping, supra. Salesforce further states that, unless an event is flagged otherwise, a visit is created or updated for the user to whom the event belongs. Interaction Event Options, supra. None of the events from Plaintiff's session carried any such flag.

50. A persistent Salesforce identifier of exactly that form, sixteen hexadecimal characters, was transmitted in named fields of each of the requests described above, and it held a single value throughout Plaintiff's session. That same value was already present in two first-party cookies on Plaintiff's browser before the first page of the session was requested, so it did not originate in the session in which Plaintiff was browsing.

51. Salesforce documents a consent field on each event, which holds the user's consent status, such as an opt-in or an opt-out, for a stated purpose such as personalization. Interaction Event Options, supra. Every event from Plaintiff's session carried that field, and in every event it was empty. A first-party Salesforce cookie in Plaintiff's browser, which recorded the same anonymous identifier, likewise held an empty list of consents.

52. Salesforce states that its library tracks a visitor whenever it is supplied either no consent value or any value other than an opt-out for the purpose of personalization, and Salesforce recommends that website operators supply an opt-out consent by default until the visitor has opted in. Web Integration, Salesforce Developers, https://developer.salesforce.com/docs/marketing/personalization/guide/web-

integration.html. Defendant did not do so. The empty consent field placed Plaintiff in the category Salesforce tracks, and every transmission described above was made on that footing.

53. Salesforce states that the events its library sends are used to develop a profile of the user from the user's browsing actions, and that events are sent to Salesforce for segmentation, campaign targeting, and behavioral tracking. The Personalization Sitemap, Salesforce Developers, https://developer.salesforce.com/docs/marketing/personalization/guide/personalization-sitemap.html.

54. Mapping an arriving event to the record of the one individual it belongs to, creating or updating that individual's visit, and merging the described pages that individual has read into a profile, are operations performed on the transmitted values. None can be performed without ascertaining what those values say. The interaction name carried a description of the page in words, and it was transmitted in a field named for that purpose.

55. Salesforce did not receive only the pages Plaintiff loaded. When Plaintiff selected a link on a page, Defendant's configuration caused a further event to be sent to Salesforce carrying, in the interaction name field, the words of the link she had selected joined to the description of the page on which she selected it. When Plaintiff, reading the page on improving her credit score, selected the link to the Website's saving and budgeting page, Salesforce received "Saving & Budgeting Click on How to improve your credit score in a year Page View." When she, reading the page on saving money on a tight budget, selected the link to the Website's wealth strategy page, Salesforce received "Wealth Strategy Click on How to Save Money on a Tight Budget Page View." Salesforce therefore received not only the subject matter Plaintiff was reading, described in words, but the subject matter she reached for next.

56. Those interaction names were likewise composed under configuration Defendant deployed. The tag-management rules deployed under Defendant's account,

which Plaintiff's browser downloaded from Adobe's tag-management service during her session, read the label of the link the visitor selected and the name of the page the visitor was on, join them with the words "Click on," and pass the result to the Salesforce library to be sent as the interaction name.

57. No parameter conveying an opt-out or a privacy preference accompanied any of the transmissions to Salesforce.

58. Salesforce, Inc. is not a party to the communications between Plaintiff and the Website. It operates a marketing technology business of its own and has the capability to use its record of these interactions for its own purposes. Salesforce states that its library supports merging profile identities across different devices and channels. Web Integration, supra. Defendant aided and abetted that interception by embedding and configuring the tag on the Website.

**2. The Adobe Tracker**

59. Defendant embedded and configured on the Website data collection code operated by Adobe Inc., which Adobe markets as the Adobe Experience Platform Web SDK and deploys through its tag-management service. Plaintiff's browser downloaded Defendant's tag-management library from Adobe's servers during her session, and the transmissions that followed were directed to Adobe's collection servers and carried Defendant's configuration identifier and Defendant's Adobe organization identifier. The code is not a resource Plaintiff requested and is not necessary to render the Website's content.

60. When Plaintiff selected a link on one of the pages identified above, Adobe's code obtained the address of the page she was reading, the address of the page she had come from, the section of the Website she was in, the words describing the link she had selected, and the address that link led to, from the state of the browser at the moment of selection. It wrote those values into named fields of a structured event and directed Plaintiff's browser to send that event to Adobe. Adobe's documentation describes the page address field as the address of the current page and the referrer field as the address

of the previous page visited. Adobe states that, when that context is enabled, its library populates both fields automatically on every event sent from a page. Adobe also states that an operator may omit that information in order to comply with its own privacy policy. context (Web SDK), Adobe Experience League, https://experienceleague.adobe.com/en/docs/experience-platform/web-sdk/commands/configure/context. Defendant did not omit it.

61. Adobe documents the named fields in which its library records a link selection: the name of the link, its type, and the address it leads to. Adobe states that its library fills those fields automatically by default, taking the name from the visible text of the link, and that an operator may instead populate them itself. clickCollectionEnabled, Adobe Experience League, https://experienceleague.adobe.com/en/docs/experience-platform/web-sdk/commands/configure/clickcollectionenabled. The name field in Plaintiff's events was instead populated with the description composed by the rules deployed under Defendant's account.

62. The values Adobe received in those named fields, from Plaintiff's own session, included the full address of the page on improving her credit score and the full address of the page on saving money on a tight budget, and the site section "Financial Insights" for each. They also included the same interaction names those rules had composed for Salesforce, among them "Saving & Budgeting Click on How to improve your credit score in a year Page View" and "Wealth Strategy Click on How to Save Money on a Tight Budget Page View." The latter was sent together with the address of the wealth strategy page to which that link led.

63. Each of those events also carried, in a separate named field, a description of the page on which the link was selected, in the same words Salesforce received as each page loaded: "How to improve your credit score in a year Page View," "Saving & Budgeting | Financial Insights Page View," and "How to Save Money on a Tight Budget Page View." Adobe therefore received a description in words of each of the three pages

identified above, independent of the words of any link.

64. Each of those events was accompanied, in the body of the same request, by Adobe's identity cookie for Plaintiff's browser. That cookie carries an Adobe Experience Cloud identifier, and it held a single value across every event whose contents are recorded in Plaintiff's HAR file. The same identifier was already present in an Adobe cookie on Plaintiff's browser before the first page of the session was requested, so it did not originate in the session in which Plaintiff was browsing.

65. In addition, as each of the pages identified above loaded, and without any action by Plaintiff, code on the Website supplied by Adobe for its Target product, a library Adobe calls at.js, caused Plaintiff's browser to send a request to Adobe's Target servers. Adobe documents that version 1.x of that library sends its requests to an endpoint on Adobe's Target domain whose path carries the customer's client code. The requests from Plaintiff's browser were sent to Adobe's Target domain, at the path Adobe documents for that version, with Defendant's client code in the path. Each carried, in named parameters, the full address of the page then being loaded, the address of the page before it, the domain of Defendant's Website, and a persistent Target identifier. Adobe's documentation of those parameters describes the first as the page URL, the second as the page referrer, the third as the domain of the page on which the Target library runs, and the fourth as Target's own identifier for the visitor, which Adobe calls the TNT ID. How Do I Upgrade from at.js Version 1.x to Version 2.x?, Adobe Experience League, https://experienceleague.adobe.com/en/docs/target-dev/developer/client-side/functions-overview/upgrading-from-atjs-1x-to-atjs-20. That identifier was held in a first-party cookie on Plaintiff's browser that was set to expire in August 2028, nearly two years after her visit.

66. Recording which named link a visitor selected on which described page, and attributing that selection to an identifier that recognizes the visitor's browser across visits, are operations performed on the transmitted values. Neither can be performed without ascertaining what the transmitted address and words say and determining that

they belong with the identifier transmitted alongside them.

67. No parameter conveying an opt-out or a privacy preference accompanied any of the transmissions to Adobe whose contents are recorded in Plaintiff's HAR file.

68. Adobe Inc. is not a party to the communications between Plaintiff and the Website. It operates a marketing technology business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the code on the Website.

**3. Interception While in Transit**

69. Two sets of code ran as part of Plaintiff's browser's single attempt to load each page identified above. The first was the Website's own code, which delivered the page Plaintiff had asked for. The second was the Trackers' code, which Plaintiff did not request and which served no part of her request for that page. Plaintiff communicated with Defendant's servers in order to obtain the content she was reading. She did not communicate with either Third Party for that purpose, or for any purpose of her own.

70. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records, and there was no separate transaction in which Defendant later furnished them. The values the Trackers transmitted were read from the state of the browser for the page then being loaded, or for the link then being selected, and they identified that page and that link and no other.

71. The Salesforce Tracker acquired the contents of Plaintiff's communications at the point those contents existed in her browser as part of the page she had requested. Its code, executing within the load of that page, read the page's address and the words of its title out of the state of the browser for that page, and held those values before composing and dispatching any request of its own. What that code obtained, it obtained from the communication itself.

72. When Plaintiff selected a link to another page of the Website, the act of selection was itself a communication to Defendant: it was the means by which she requested the page she wished to read next. At the moment of selection, the Trackers'

code captured the words of that link together with a description of the page on which it was selected and, in the case of Adobe, the address to which the link led. It captured those values from the same browser state from which her request for the next page was composed, and dispatched them to the Third Parties as her browser carried out her request. What that code obtained, it obtained from the communication as it was being made.

73. Each of those transmissions was therefore initiated by the Trackers' own code, executing within the load of the page Plaintiff had requested or within her selection of a link on it, and the contents of those communications were acquired while in transit.

74. The duplication was not a single copy. As each of the pages identified above loaded, the address of that page and its title, as rewritten under Defendant's configuration, were written into named fields of a request to Salesforce; the rewritten title was written again into a second, separate request to Salesforce; and the address of that page was written into a further request to Adobe. When Plaintiff selected a link, the address of the page she was reading, a description of that page, and the words of that link were written into a request to Salesforce and, separately, into a request to Adobe. The contents of Plaintiff's communications with the Website were therefore replicated and routed to two commercial recipients over separate channels. Plaintiff did not request content from either recipient, neither was a party to her communications with the Website, and neither was made known to her.

75. The transmissions that accompanied each page load required no action by Plaintiff whatever. None of the transmissions described above was visible to Plaintiff, and she had no opportunity to see, review, prevent or object to any of them before it occurred. Plaintiff was given no indication that selecting a link on a page would cause a description of that selection to be transmitted to either Third Party.

76. Defendant knew of this arrangement and constructed it. Defendant's own account identifier and dataset name are carried on every Salesforce transmission described above. Defendant's own configuration identifier is carried on every

transmission to Adobe's collection servers, and Defendant's own organization identifier is carried on every such transmission whose contents are recorded in Plaintiff's HAR file. Defendant's own client code is carried in the path of every transmission to Adobe's Target servers. Defendant obtained an account with each Third Party, deployed each Third Party's library on the Website, and configured that code to execute automatically when visitors load pages of the Website and select links on them. Defendant went further and deployed the configuration under which each page, and each link selected, was described in words before those words were written into the outbound transmissions.

## VII. CLASS ALLEGATIONS

77. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more of the Trackers, or by any other third party to which Defendant caused those contents to be transmitted, between September 2, 2025 and the present.

78. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members are ascertainable from Defendant's records and the records of the Third Parties, including the records of visits that each Tracker attributed to persistent identifiers during the class period. Class Members can be notified of the pendency of this action by published notice and by notice through the Website.

79. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common questions include, without limitation:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to both Trackers, and the titles of the pages they viewed and the words of the links they selected to one or both of

them;

- Whether the URL contents of those requests, the titles of the pages visitors viewed, and the words of the links they selected constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion; and
- Whether Class Members are entitled to restitution of benefits Defendant obtained through the challenged conduct.

80. TYPICALITY: As a person who visited the Website and whose URL contents, page titles and link words were intercepted as alleged above, Plaintiff is asserting claims that are typical of the Class. Plaintiff and the Class Members were subjected to the same configuration of the Website and the same Trackers, and their claims arise from the same course of conduct and rest on the same legal theories.

81. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation and in privacy litigation of this kind, and Plaintiff has no interests antagonistic to those of the Class.

82. SUPERIORITY: A class action is superior to other available methods of

adjudication because individual litigation of the claims of all Class Members is impracticable. The damages suffered by each individual Class Member are small relative to the burden and expense of individual litigation, and individualized litigation would create the risk of inconsistent adjudications and would burden the courts. A class action presents fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VIII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against Defendant

83. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84. Plaintiff brings this cause of action on behalf of herself and the Class.

85. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained. The same subdivision separately reaches any person "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

86. The page addresses, the page titles identifying the subject matter of the pages Plaintiff and Class members were reading, and the words appearing on the links they selected, all transmitted in named payload fields, constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, Defendant caused the page addresses and the words describing the pages to be duplicated and routed over separate channels to Salesforce as each page loaded, and caused the page addresses, the words describing the pages, and the words of the links selected to be routed to both Salesforce and Adobe as each link was selected, at the endpoints identified above, and each recipient acquired the contents it received

while the same communication was in transit.

87. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses, page titles and link words as set out above, and permitted the Third Parties to use that information for the identification, attribution, profiling and targeting functions alleged above. The Third Parties are not parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies. Defendant is independently liable under the aiding provision of § 631(a). Defendant selected each Tracker, obtained an account for it, embedded its code on the Website, configured that code to execute automatically on page load and on the selection of links, deployed the configuration that described each page and each link in words, and caused Plaintiff's own browser to carry out each transmission. In doing so Defendant aided, agreed with, employed and permitted each Third Party to do the acts prohibited by § 631(a), and permitted and caused those acts to be done.

88. Section 631(a) reaches not only reading the contents of a communication but learning its contents or meaning. Attributing a described page to an identifier that recognizes a visitor across visits, selecting the user record to which an arriving event belongs, and recording which named link a visitor selected on which described page, are each operations performed on what she transmitted, and none can be performed without ascertaining what the transmitted values say.

89. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

/ / /

/ / /

## IX. SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against Defendant

90. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Plaintiff brings this cause of action on behalf of herself and the Class.

92. 18 U.S.C. § 2511(1)(a) reaches any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

93. The page addresses, the page titles, and the words appearing on the links Plaintiff and Class members selected are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8), because they communicate the substance, purport and meaning of what Plaintiff and Class members were reading and reaching for. As described in the preceding tracker-specific allegations, Defendant caused those contents to be duplicated and routed over separate channels to Salesforce and to Adobe, at the endpoints identified above, and each recipient acquired the contents it received while the same communication was in transit.

94. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses, page titles and link words to the Trackers as set out above, and permitted the Third Parties to use that information for the functions alleged above. Defendant thereby intercepted those communications and, independently, procured each Third Party to intercept them, by selecting each Tracker, obtaining an account for it, embedding and configuring its code on the Website, deploying the configuration that described each page and link in words, and causing Plaintiff's own browser to execute that code and transmit the contents. The Third Parties are not parties to the communications between Plaintiff and the Website. Plaintiff and Class members

did not consent to this interception, and no other exception applies.

95. Defendant's status as a party to the communications does not render its conduct lawful. Under 18 U.S.C. § 2511(2)(d), a party's consent is no defense where the communication is intercepted "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." California makes it a crime, punishable by fine and imprisonment, for any person, without the consent of all parties to a communication, to read, attempt to read, or learn its contents while it is in transit, to use any information so obtained, or to aid, agree with, employ, or permit another to do those acts. Cal. Penal Code § 631(a).

96. Defendant intercepted Plaintiff's and Class members' communications, and procured their interception, for the purpose of enabling Salesforce and Adobe to read and learn the contents of those communications without the consent of all parties, and to use the information so obtained for the identification, profiling, and targeting functions alleged above. Defendant's purpose was likewise to aid, agree with, employ, and permit Salesforce and Adobe to commit those acts. Each is a crime under the laws of California. Those criminal acts are distinct from the interception alleged in this count. They are the reading and use of the contents by persons other than Defendant, which occurred after Defendant's configuration had caused the contents to be acquired and directed to them, and Defendant's aiding of that reading and use.

97. In the alternative, Defendant's purpose was to knowingly access, and without permission take, copy, and make use of, data from the computers and devices of Plaintiff and Class members, namely the addresses and titles of the pages they were reading and the words of the links they selected, which is a crime under the laws of California. Cal. Penal Code § 502(c).

98. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of the sum of actual damages suffered by Plaintiff and the Class and any profits made by Defendant as a result of the violation, or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, together

with punitive damages, injunctive and declaratory relief, and reasonable attorney's fees and costs.

## X. THIRD CAUSE OF ACTION

**Violations of Business & Professions Code § 17200**

**By Plaintiff and the Class Members Against Defendant**

99. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100. Plaintiff brings this cause of action on behalf of herself and the Class.

101. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes an unlawful and unfair business practice within the meaning of that section.

102. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated Cal. Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a), each of which serves as a predicate for liability under the unlawful prong of § 17200.

103. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to two third-party Trackers, together with the titles of the pages they viewed and the words of the links they selected, each described in words composed under configuration Defendant deployed and attributed to persistent identifiers assigned to their browsers. The harm to consumers from that conduct outweighs any utility it may have to Defendant, the practice offends established public policy as expressed in CIPA and the Federal Wiretap Act, and it is immoral, unethical, oppressive and unscrupulous.

104. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a person reads on a financial institution's website has recognized economic value, as reflected in the market for such data and in the price of the personalization and analytics services that depend on it. Plaintiff and Class members were deprived of the

value of their data and of their right to control its dissemination.

105. Defendant appropriated that value for its own purposes without disclosure, without consent, and without compensation. Defendant obtained the benefit of the Third Parties' identification, attribution, profiling and targeting services at the expense of Plaintiff's and Class members' privacy.

106. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of money or property Defendant acquired by means of those practices, and such other relief as the Court deems just and proper.

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against Defendant

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108. Plaintiff brings this cause of action on behalf of herself and the Class.

109. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of that right, a plaintiff must show a legally protected privacy interest, a reasonable expectation of privacy in the circumstances, and conduct by the defendant constituting a serious invasion of privacy.

110. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific pages they read and the links they selected, and in controlling the dissemination of that information to third parties.

111. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a bank's website to read about improving a credit score or saving money on a tight budget does not expect that the address and title of each page read, and each link

selected, will be described in words and transmitted to two marketing technology companies, attributed to identifiers that recognize that person's browser across visits.

112. Defendant's conduct constitutes a serious invasion of that privacy. By embedding and configuring the third-party tracking technologies described above on the Website, and by deploying the configuration that described each page and link in words, Defendant caused the contents of Plaintiff's and Class Members' communications to be intercepted and disclosed to third parties without notice or consent, in a manner that is an egregious breach of social norms.

113. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the diminished value of that information. Plaintiff and the Class are entitled to nominal damages and to injunctive relief.

## XII. <u>FIFTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

114. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

115. Plaintiff brings this cause of action on behalf of herself and the Class.

116. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion be highly offensive to a reasonable person.

117. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding third-party tracking technologies on the Website, configuring them to execute automatically on page load and on the selection of links, and deploying the configuration that caused the contents of those communications to be described in words and transmitted to the Third Parties. Plaintiff and Class Members had a reasonable expectation that the contents of

their communications with the Website would not be disclosed to third parties without their consent.

118. The intrusion is highly offensive to a reasonable person. The pages identified above are descriptive on their face, and the addresses and titles transmitted identify the specific personal financial subject matter each visitor was reading about, including how to improve a credit score and how to save money on a tight budget. Those subjects are the reader's own personal financial considerations. Defendant covertly caused the addresses of those pages, their titles, and the words of the links the visitor selected to be transmitted to two separate commercial companies, attributing all of it to persistent identifiers assigned to the visitor's browser. A reasonable person would find the covert transmission of the specific financial subject matter of her own reading to commercial companies, together with its description in words, without prior notice and without any opportunity to prevent it before it occurred, highly offensive. The offensiveness is measured objectively and does not depend on any characteristic particular to Plaintiff.

119. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the loss of control over their personal information. Plaintiff and the Class are entitled to compensatory and nominal damages and to injunctive relief.

## XIII. SIXTH CAUSE OF ACTION

**Restitution and Quasi-Contract (Unjust Enrichment)**

**By Plaintiff and the Class Members Against Defendant**

120. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

121. Plaintiff brings this cause of action on behalf of herself and the Class.

122. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without paying for its value.

123. Defendant received a benefit from the conduct alleged above. Defendant deployed the Trackers under its own accounts in order to recognize the visitors to its Website across visits, to learn what those visitors were reading about and reaching for, and to build profiles of those visitors for the personalization and marketing of its own banking products to them. The contents of Plaintiff's and Class Members' communications with the Website were the input that made those capabilities available to Defendant, and Defendant obtained them without paying Plaintiff or Class Members anything.

124. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value, and Defendant appropriated that value, and the services built upon it, without authorization or compensation.

125. It is inequitable for Defendant to retain those benefits without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value and who never agreed to its collection or use.

126. Plaintiff and the Class seek restitution of the benefits Defendant obtained from the interception and commercial exploitation of Plaintiff's and Class Members' communications, in an amount to be determined at trial.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000

per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of the sum of actual damages and any profits made by Defendant as a result of the violation, or whichever is the greater of $100 a day for each day of violation or $10,000;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution of the benefits by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: November 25, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*

Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*